Filed 8/11/25  Marian A. v. Corina G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MARIAN A., <br><br> Appellant, <br><br> v. <br><br> CORINA G., <br><br> Respondent. | D083483 <br><br><br> (Super. Ct. No. 19FL005322N) |

APPEAL from an order of the Superior Court of San Diego County, Daniel Segura, Judge.  Affirmed.

Marian A., in pro. per., for Appellant.

Linda Cianciolo for Respondent.

INTRODUCTION

Corina G. left San Diego County with her two children to a confidential address in Los Angeles County because she feared continued abuse by her former husband and the children's father, Marian A.  After obtaining a domestic violence restraining order (DVRO) for her and the children's protection, she sought a court order for sole legal and sole physical custody of the parties' two minor children to allow them to relocate with her.  The trial

1

court granted her move-away request. Because Marian has failed to demonstrate any error on appeal,[1] we affirm the court's order.

BACKGROUND

I.

*Prior Custody Arrangement*

Corina and Marian were married nine years and have two children. In February 2021, the parties entered a stipulated judgment with a marital settlement agreement (MSA) to dissolve their marriage. Under the MSA, the parties shared joint legal and joint physical custody of the children on a 2/2/5 schedule.[2] They also agreed that Corina would reside with the children in the "main house of [Marian's] residence" on Lilac Ridge Road in San Diego County (Lilac home), while Marian "may stay in the loft of the main house . . . intermittently with notice to [Corina] or he shall reside in the guest house of the residence."

---

[1] In an unsigned minute order, the trial court directed Corina's counsel to prepare the findings and order after hearing (FOAH). Marian filed his notice of appeal on October 23, 2023, prior to the entry of the FOAH, and therefore he has not appealed from an effective order. (See *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1170.) We obtained the February 21, 2024 FOAH from the superior court and, by order issued on March 4, 2024 we construe Marian's appeal to be from the FOAH. (See Cal. Rules of Court, rule 8.104(d); *Vitkiecvicz v. Valverde* (2012) 202 Cal.App.4th 1306, 1310, fn. 2.)

[2] At the time Corina left San Diego with the children, there was no court order in place requiring she provide Marian with notice or obtain his consent or a court order to relocate the children. We are aware of no authority either that required her to do so as the concurrence suggests. We thus see no reason for the concurrence's concern that our affirmance of the trial court's move-away order might "be read as an endorsement of parents without a final custody determination preemptively moving their children out of their county of residence without first obtaining either the consent of the other parent or a court order." (Conc. opn., *post*, at p. 3.)

2

## II.

### *DVRO*

On August 8, 2022, Corina filed a request for a DVRO against Marian based on an August 5 incident. The trial court issued a temporary restraining order (TRO) protecting Corina and the children (then nine and seven years old), ordering Marian to stay away from the Lilac home, and granting Corina temporary sole legal and sole physical custody of the children with no visitation by Marian. As a result of the incident, Marian was arrested on August 8 and released with no charges filed. The next day, on August 9, Corina took the children to her family in Los Angeles County because she did not feel safe living near Marian. She and the children had also been locked out of the Lilac home by Marian.[3]

After an evidentiary hearing on September 2, 2022, in which both parties were represented by counsel, the trial court (Judge Daniel Segura) issued a two-year DVRO against Marian, based on the following evidence.

Corina testified she was at her Lilac home with her boyfriend, Shawn S., on August 5, 2022. At about 10:00 p.m., Marian showed up at the front door "screaming" and "yelling . . . get that fucker out of the – that F out of the house. Get him out now. Get out of here." Marian had the children with him (it was his parenting weekend) and they were barefoot and "in their underwear." Knowing that once Marian is "irate, there's no calming him down," Corina told Shawn they needed to leave because her children were there.

---

[3] After these events, Marian presented Corina with a stipulation to modify the MSA and TRO to give him "exclusive rights of use and possession" to the Lilac home, among other things. The parties signed the stipulation and filed it with the court on September 2, 2022.

Corina and Shawn went through the garage to leave but Marian was waiting for them there.  He continued yelling, "Get out of here, . . . get the fucking guy out of here.  Go get a hotel.  You're in breach of contract.  I'm going to call my attorney.  I'm going to call the cops."  As her "body was shaking" in fear of Marian, Corina tried to call the police herself.  Corina urged Shawn to get in her car so they could leave.  Marian then yelled at Shawn, "Get the fuck out of here.  Get the fuck out of my house.  Start walking."  Shawn responded, "You don't know who you are talking to."  Marian then told Shawn, "You don't know who you are talking to, motherfucker. . . .  I'm going to drop you right now."  Suddenly, Shawn's demeanor changed from "standing firm" to "retreating towards the car."  As he moved towards the car, Shawn whispered to Corina, "Gun."

Marian advanced towards Shawn and "pushe[d]" Corina while she was looking down at her phone.  Corina could not "look at Marian because he's . . . a scary person to look at when he's raging."  But something called him away and Marian "hopped in [his] car with the children in the car" and left.  Corina felt they could not stay there either and drove away in her car with Shawn.  On the road, she finally connected to 911 and met sheriff deputies at a nearby grocery store, where she reported what happened.

Four minutes before he confronted Corina at the Lilac home, Marian sent Corina this text message at 9:56 p.m.:  "He (sic) better get your buddy out of my fucking house right now.  I'm bringing the kids home tonight.  Get that loser out of my house.  Thereof, you shall receive no more monetary compensation being in said breach. . . .  Always knew you were a fucking

4

whore."[4]  Corina, however, did not see this text message until she was speaking with the police; nor did she see Marian with a gun.  She testified to "other incidents when [she was] afraid of Marian when he was raging."  In some of these incidents, Marian threatened to kick her out of the home.

Shawn testified Corina became "visibly upset" and "very nervous" when she realized Marian was at the front door of the home.  Marian began a "string of angry get-out-now type of stuff," including telling them, "Get out of my house . . . You don't have permission to be here.  Get this fucking loser out of here.  I am calling the cops."  He and Corina tried to leave through the garage, but Marian stood in the garage entryway where Corina's car was parked.  Marian was "very angry" and "irate" and threatened Shawn "a few times."  Shawn tried to deescalate the situation, telling Marian, "Hey, you know, you don't know who you're talking to."  This made Marian "more excited" and he replied, "You don't know who you're talking to, motherfucker."  Marian then lifted his shirt to display a gun in his waistband.  He took the gun out, aimed it at Shawn's chest, from a distance of "probably eight or so feet away," and said to Shawn, "I will drop you right fucking now."  As Shawn threw his backpack in the back of the car to leave, Marian "pushed" Corina.  Shawn and Corina then got in the car and drove away.

---

[4]     Under the MSA, Marian agreed to pay Corina $1,000 each month in base child support and, as additional child support, he would pay the mortgage, property taxes and home insurance on the Lilac home, healthcare for Corina and the children, the premium on a life insurance policy that named Corina the beneficiary, for four years while Corina continued to live at the Lilac home.  Marian also agreed to pay Corina spousal support in the total amount of $50,000 within four years in at least equal annual installments of $12,500 each year.

Marian denied he had a gun or made any "death threats." He testified he went to the Lilac home with the children to get a change of clothes for them; "[t]hey were still in their damp pool clothes" from a pool party that ended at 9:20 p.m. On the way, he received a notification from his security system "that people were there about five minutes before [his] arrival." He then texted Corina, "I'm coming with the children. Get the guy out of here." When he arrived with the children, they went to the front door and upon seeing Shawn, Marian said, "You got about ten seconds to get out of here, pal." He immediately took the children back to his car, but Corina "confront[ed]" him at the front door. He told her "this was grossly inappropriate" and "[s]he should get a hotel."

According to Marian, Corina returned inside the house. Marian got back into his car and moved it to "mak[e] every available passageway for them to leave." He then stood outside his car with the engine running to "ensure that they would depart." He then testified, "I saw Shawn . . . for the first time" as Corina and Shawn were exiting through the laundry-room door into the garage. In the garage, Shawn told Marian, "This isn't your fucking house," and the two men got into a verbal exchange, during which Corina "held [Shawn] back as he aggressed" toward Marian. Marian "didn't want to argue anymore" and "made a very rational decision to exit the property of [his] own home with [his] children and seek . . . a safe place of refuge," which was the home of his girlfriend Jasmine J. As he left with the children, Marian saw Jasmine outside the gate to the property, which was about 80 to 100 feet from the garage.[5]

---

[5] Jasmine, whom neither Shawn nor Corina saw at the Lilac home at the time of the incident, testified she arrived at the property at about 10:00 p.m. and, at an approximate distance of 70 feet, saw Marian, "a man," and Corina. She never saw Marian with a gun or Marian threaten to harm anyone.

On the following Monday, August 8, 2022, Marian was scheduled to return the children to Corina's care. Marian testified he would normally drop off the children at the Lilac home pursuant to their agreement. But this time, Corina "asked for a safe alternate location to deliver the children." Marian declined her request and told her, "let's keep it" to "what is agreed" and he took the children back to the Lilac home. When he arrived, Marian was arrested.

In ruling that Corina had satisfied her burden entitling her to a DVRO, the trial court found aspects of Marian's testimony to be "totally inconsistent." Specifically, the court found the text message Marian sent to Corina "most troubling" as it belied his stated intention of going to the Lilac home for the "sole purpose" of getting clothes for the kids, which he also failed to do. While the court stated it "has suspicions about whether or not there was a gun," the court determined it did not need to make that finding to issue a DVRO. It was enough, the court said, that Marian disturbed Corina's peace by confronting her in the manner he did and that he used statements "to try to control" her behavior, in the presence of her children. Additionally, the court found that Marian pushed Corina.

On December 8, 2022, Marian, through his counsel, filed a motion for new trial pursuant to Code of Civil Procedure section 657 to vacate the DVRO and set "a new trial" on the basis of "[n]ewly discovered evidence." The trial court denied the motion on January 3, 2023. Marian did not appeal the issuance of the DVRO or the denial of his motion for a new hearing.

III.

*Move-Away Order*

On August 24, 2022, pending her request for a DVRO, Corina filed a request for order (RFO) allowing the children to move with her to Los

7

Angeles County. Judge Segura conducted a lengthy evidentiary hearing that spanned episodically over five days. Both parties were represented by counsel for the first three days, until the fourth day when Marian proceeded in propria persona for the rest of the hearing. After hearing testimony from both parties and seven witnesses, the court granted the RFO.

A.    *Child Custody Orders Since TRO and Family Court Services Mediation*

The temporary child custody order issued with the TRO denied Marian visitation. It was subsequently modified to allow Marian professionally supervised visitation with the children one day per week up to four hours. The parties then attended a court-ordered mediation with Family Court Services (FCS) in October 2022. FCS recommended the trial court grant Corina sole legal custody and that the children reside with her. It recommended Marian be allowed supervised parenting time for up to 12 hours every other weekend, for up to six hours on Saturday and six hours on Sunday. Beginning December 2022, the trial court modified the temporary child custody order to allow Marian parenting time with the children on each Saturday and Sunday from 11:00 a.m. to 5:00 p.m., to be supervised by Marian's mother, Mildred M. The exchanges were ordered to occur at an Oceanside McDonald's restaurant and to be supervised by a professional monitor or, by mutual agreement, a non-professional monitor.

B.    *Testimony*

1.    <u>Alphonso M.</u>

Alphonso M. was Marian's platoon sergeant and had known Marian for about 28 years. Alphonso "almost consider[s]" Marian "like a son." Alphonso met Corina after she married Marian and had known her for about 10 years. In 2019, Marian and Corina asked Alphonso and his wife to "mediate" issues they were having in their marriage. When the four met, Marian shared he

did not love Corina anymore. When the parties revealed they were sleeping in separate rooms, Marian confessed, "he had dreams or thoughts about choking [Corina] or hurting her, so that's why he stayed in separate rooms."

In response, Corina told Marian she believed he "should get help." That night, Corina took the kids and left. Alphonso understood "she was scared for her life."

Two days later, Alphonso accompanied Marian to see a psychiatrist. But after the psychiatrist explained to Marian, in response to his question, that "anything he said would be used against him in court" if she were subpoenaed, Marian refused to talk to the psychiatrist. And they left.

After Alphonso learned about the August 5 incident, he asked Marian, "if he had a gun," and Marian "said yes, I had a right to protect my property." Marian told Alphonso he "parked away so the kids wouldn't see" and "the kids didn't see it." Based on Marian's admission, Alphonso was "concerned for Corina's well-being." But when they spoke again two weeks later, Marian told Alphonso, "I never said I had a gun."

Later Marian asked Alphonso to sign an affidavit "for the court" that Marian had prepared. The affidavit contained statements about what had taken place during their 2019 conversation when Alphonso and his wife were asked to mediate their marital issues. Marian "left out" the part about his dreams of choking or hurting Corina. Alphonso declined to sign it.

2.    Corina

Corina testified she was requesting a move-away order because she "no longer feels safe living in . . . San Diego County." She wanted to relocate to Los Angeles where she had family and support and could afford to be on her own.

9

In April 2019, Marian told Corina he had "feelings of anger and hat[red] towards" her, "where he said he would not share a bed with [her] because he had demons inside of him, and he had concerns about killing [her] in [his] sleep." Corina reached out to Alphonso and his wife with concerns about Marian's mental health, hoping they would help her with "an intervention" because she did not know what else to do. After the intervention at Alphonso's house, "Marian was even more upset" with Corina because she had shared their issues with friends. Afraid, Corina left with the children that night. Corina let Marian know she was in Los Angeles and offered him a visit with the children at a park, but he did not come. A week later, Corina returned to Marian, hoping he appreciated the seriousness of their situation and that they could work through their issues.

The day after the August 5, 2022 incident, Corina returned to the Lilac home with her brother to collect her belongings. She had asked sheriff deputies to "do a security sweep" of the property before she arrived so they could safely go inside the house. While there, she asked the deputies if she could take down the Ring camera because it made her feel "very uncomfortable." However, from a remote location, "Marian set off the alarms" and started speaking to them "through the Ring camera."

On August 8, 2022, Corina returned to the house again for the parties' scheduled exchange of the children. She and the children discovered they had been locked out of the home. The front gate to the property had been zip-tied, the garage door disabled, and she no longer had access to the main house where she and the children had been living. The children were "extremely upset" and "in shock" because they could not get inside their home. The next day, Corina took the children to her family in Los Angeles because she "[didn't] feel safe living near Marian."

During their separation between 2019 and 2022, Corina discovered a camera installed on top of a storage cabinet, in between two bags, in the garage of the Lilac home. She found another camera in the upstairs loft of the house. Marian never advised her that either camera had been installed.

At the time of the hearing, Corina was renting a one-bedroom unit on her sister's Los Angeles property and had access to amenities and a yard. The children were enrolled in school where they were both thriving socially and academically. They were participating weekly in dance classes and bible study. And since September 2022, they attended weekly therapy sessions. Corina's large immediate family in Los Angeles were close by and provided her with support and help with the children. The children also had friends and cousins their age in Los Angeles. Neither she nor Marian had family living in San Diego. Corina, however, facilitated the children's visits with friends and maintained their contact with family and church friends and past teachers in San Diego.

The distance between Corina's home in Los Angeles and the Oceanside meeting point for exchange of the children was 80 miles. Corina's drive time was, on average, an hour and a half between the two locations. Corina had ensured the children never missed any of their visitations with Marian. However, after a visitation with Marian in September 2022, the children returned to her in "an emotional mess" and, since then, the children had difficulty with the exchanges. At one exchange, the older child refused to leave the toilet stall of the McDonald's restaurant to meet Marian and, with the help of her mother-in-law, Corina encouraged the child to come out and "be part of the visitation."

After the second child was born, Corina stopped working to be at home full time. Throughout their marriage, Marian often traveled for work and

11

would be gone "for weeks at a time" so that "he was gone a lot." She took the children to their doctor appointments, school appointments, and parent-teacher conferences during the marriage. Since September 2022, Marian had not inquired about their schooling or doctor appointments.

### 3. Sergeant Brendan Cook

Sergeant Brendan Cook was the patrol sergeant the night of the August 5, 2022 incident and responded to Jasmine's house where Marian was located. Marian refused to come out of the house and refused to let deputies inside to check on the children's welfare. He permitted the deputies to see the children only through a window. Although the deputies had probable cause to arrest Marian that night, Sergeant Cook did not believe there were exigent circumstances to enter the house to effectuate the arrest. The deputies determined "that seeking an arrest warrant that night would only exacerbate the situation particularly if [Marian] was armed and the children were inside" the home.

On August 6, 2022, when Corina and deputies were at the Lilac home for her to collect her belongings, Sergeant Cook spoke with Marian who "express[ed] his displeasure that deputies were permitting cameras to be removed" from the Lilac home. It was Sergeant Cook's belief, based on his interactions with Marian, that Marian was using the cameras to keep Corina "under surveillance."

### 4. Marian's January 22, 2023 Text Messages to Corina's Friends and Family

On January 22, 2023, while the TRO was in effect, Marian sent text messages to numerous persons who were friends with the parties or members of Corina's family and included "a photograph collage" of Corina. Alphonso, who received the text, testified it stated, "this is the guy that she had been seeing for the past – the whole time that they've been married, . . .

12

supposedly had been like a friend, turned out to be her boyfriend" and "that they were trying to take the kids away from him." Corina testified she was at the home of another friend, Jason C., when Jason received and showed her the text with her pictures. She then heard from four other persons, including friends and her nephews, that they had received the same text message. Jason testified he "was startled to see" the text when he received it.

Marian admitted he sent the text with photographs of Corina to "a handful of good friends who knew [them] both," including Jason and Alphonso, and Corina's family, asking, "Do you know this guy who destroyed my family?" He claimed he was trying to find people to testify on his behalf.

5.    Marian's Testimony and Testimony Regarding Marian's Programming and Parenting

Marian testified he moved all of his firearms that were "not an antique that could fall apart" from the Lilac home to Jasmine's home on August 6, 2022, because he "felt that Corina made the [Lilac] house unsafe with the threats." His firearms were subsequently seized from both the Lilac home and Jasmine's home.

Marian called four witnesses to testify about his efforts to address domestic violence and his parenting of the children. His mother, Mildred, testified the children enjoy a "strong bond" with Marian.

Demar Young, the owner of Reflections Counseling, issued a certificate of completion of a 16-week anger management course to a person named Marian A., though he could not identify Marian because he never met him. The course was a group class conducted on Zoom and Young could not say whether the person on the certificate participated in the sessions because he did not teach the class.

Charleston Dean owns Motivation Specialist, LLC. and is a behavior health specialist for the company, treating addiction and "other maladaptive

13

behaviors," including domestic violence. He holds a master's degree in counseling psychology and religious studies, and a doctorate in clinical psychology, but he is not board certified nor licensed. In September 2022, Marian completed a six-hour co-parenting course administered by Dean. He described Marian as a "[g]ood student." Marian also completed about seven months and was "doing very well" in a 52-week domestic violence education course.

Dean understood the incident that prompted Marian's need to complete domestic-violence education involved "a moment" where "some boundaries were crossed." Marian told Dean he "visited a property unannounced," the "gentleman" with Corina "accosted" him and used "aggressive verbiage" against him. Marian did not tell Dean he pushed Corina, that the children were present, or that he had a gun. He also did not share with Dean that in 2019 he had thoughts of harming Corina.

Dean also conducted a one-hour mental-health assessment of Marian and determined he was experiencing anxiety and situational depression. Dean described Marian's emotional IQ to be "[r]ather sound." And at Marian's request, Dean had also supervised three exchanges of the children in December 2022. On all three occasions, the children were "happy coming and going" between the parties.

Peata Wilson supervised exchanges for the parties. She did not observe Marian "provoking the children's emotions to a negative state," nor the children expressing any fear of him. The children asked Wilson when they were going to spend more time with Marian. She found Marian to be "very engaged" and "hands on and very supportive" of the children. She never observed Marian act in any way that was dangerous to the children. She

14

believed the children loved both of their parents and desired more time with Marian.

C.    *Trial Court's Ruling*

The trial court found there was a history of abuse by Marian and he had not overcome the presumption under Family Code[6] section 3044.  The court rejected the evidence presented by Marian to rebut the presumption, in particular the testimony by Marian's therapist (Dean), as "wholly lacking." The court found that Marian "continued to express that the finding of abuse was inappropriate" and failed to recognize the circumstances that warranted issuance of the DVRO.  Rather, he "want[ed] to re-litigate and go over what happened then, and continue[d] to blame [Corina]."  The court evaluated and weighed the factors set forth in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1098 (*LaMusga*) and concluded it was in the children's best interests to be in Corina's sole legal and sole physical custody and permitted their move to Los Angeles.  The court maintained Marian's supervised weekend visitation as previously ordered.

## DISCUSSION

### I.

### *Rules Governing Appellate Review*

We begin with the rules of procedure that govern this appeal.  Although Marian is representing himself in this appeal, we may not exempt him from the rules of appellate procedure.  (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247 (*Nwosu*).)  He must follow the same rules that apply to lawyers. (*Ibid.* [self-represented litigants are afforded " 'the same, but no greater consideration than other litigants and attorneys' "]; see *McComber v. Wells*

---

6    Further undesignated statutory references are to the Family Code.

(1999) 72 Cal.App.4th 512, 523 ["Although [appellant] is representing herself in this appeal she is not entitled to special treatment and is required to follow the rules."].)

Because we must presume a trial court's judgment or order is correct (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564), it is the appellant's burden to show error. To do so, the appellant must present this court with an adequate record for review, regardless of whether the record is prepared by an attorney or, as here, by a party. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574–575; *Nwosu, supra*, 122 Cal.App.4th at p. 1246.)

California Rules of Court, rule 8.124[7] sets forth the required contents of an appellant's appendix, Marian's choice of record. Relevant here, an appellant's appendix "must" contain "[a]ny . . . document filed or lodged in the case in superior court" and "[a]ny exhibit admitted in evidence, refused, or lodged" that is necessary for proper consideration of the issues on appeal. (Rule 8.122(b)(3)(A) and (B); Rule 8.124(b)(1)(B) [appendix must contain "[a]ny item listed in rule 8.122(b)(3) that is necessary for proper consideration of the issues . . . [and] any item that the appellant should reasonably assume the respondent will rely on"].) As important, an appendix "*must not*" contain "documents or portions of documents filed in superior court that are *unnecessary for proper consideration of the issues.*" (Rule 8.124(b)(3)(A), italics added.) The appellant's appendix in this case does not comply with these rules. It fails to include the DVRO, the exhibits admitted in evidence at the move-away request, which are highly relevant to the issues on appeal, and it includes many documents never presented to the trial court at the hearing resulting in the challenged order.

---

7      All further rules references are to the California Rules of Court.

Rule 8.204 sets forth the rules relating to appellate briefs. It requires an appellant to "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority" (rule 8.204(a)(1)(B)) and to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears" (rule 8.204(a)(1)(C)). Further, an appellant is required to "[p]rovide a summary of the significant facts *limited to matters in the record.*" (Rule 8.204(a)(2)(C), italics added). In doing so, he must set forth all material facts and evidence, including facts and evidence *damaging* to his position. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.)

Marian's briefing complies with none of these rules. He devotes most of his arguments in his 76-page opening brief and 63-page reply brief to matters unrelated to the trial court's findings and order on the move-away request, presents a one-sided version of the facts, omits facts and evidence damaging to his position, and, most egregiously, relies on facts and evidence outside the appellate record. We thus disregard any asserted facts in his briefs that are not properly part of the appellate record. (*Pulver v. Avco Fin. Servs.* (1986) 182 Cal.App.3d 622, 632.) And we deem waived any undeveloped argument or contention unsupported by legal authority and proper citation to the record. (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.)

Despite these deficiencies, and his confusing briefing that tends to lack coherent legal argument, we exercise our discretion to reach the merits and will do our best to address his claims of error in this appeal.

## II.

### *Governing Law and Standard of Review*

When parents share joint physical custody of the minor children under an existing order and in fact, as the parties do here, and one parent seeks to relocate with the minor children, "the custody order 'may be modified or terminated upon the petition of one or both parents or on the court's own motion if it is shown that the best interest of the child requires modification or termination of the order.' (Fam. Code, § 3087.)" (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 40, fn. 12 (*Burgess*).) In such a case, "the trial court must determine de novo what arrangement for primary custody is in the best interest of the minor children." (*Ibid.*; accord *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 363 (*Niko*).) "[M]odification of the co-parenting arrangements is not a change of custody requiring change of circumstances. Instead, the trial court has wide discretion to choose a parenting plan that is in the best interest of the child." (*Niko*, at p. 363.) "The joint custody moving parent does not have the presumptive right to change the child's residence, and bears no burden of proving the move is essential or imperative. . . . Nor does the opposing nonmoving parent bear the burden of showing substantial changed circumstance require a change in custody or that the move will be detrimental to the child." (*Id.* at pp. 363–364, citation omitted.)

In exercising its broad discretion to choose a parenting plan that is in the best interest of the child, the trial court must look to all the circumstances bearing on the best interest of the child, including those specified in section 3011. "[A]mong any other factors," the trial court must consider "(1) The health, safety, and welfare of the child. [¶] (2)(A) A history of abuse by one parent" against the child *or against* "[t]he other

18

*parent.* [¶] . . . [¶] (3) The nature and amount of contact with both parents."
(§ 3011, subd. (a)(1), (a)(2)(A) & (a)(3), italics added.)

Additionally, in determining whether to modify an existing custody order when one parent requests to move the child's residence, the trial court is required to consider what have become known as the *LaMusga* factors. (*LaMusga, supra,* 32 Cal.4th at p. 1101.) Although not an exhaustive list, these factors include: "the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody." (*Ibid.*) Because there are no bright line rules, a court should evaluate each case "on its own unique facts." (*Burgess, supra,* 13 Cal.4th at p. 39.)

A court's application of the best interest standard may be subject to a presumption triggered by section 3044. Under section 3044, "[u]pon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child . . . there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to [the perpetrator] is detrimental to the best interest of the child." (§ 3044, subd. (a).) If the court finds the party seeking child custody has perpetrated domestic violence, it must apply the section 3044 presumption. (*Abdelqader v. Abraham* (2022) 76 Cal.App.5th 186, 196.)

19

Where the court makes a domestic violence finding, the presumption of detriment that arises from the finding is rebuttable. "The presumption is overcome . . . if the trial court finds by a preponderance of the evidence that (1) 'giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child,' and (2) specified factors, on balance, support legislative findings concerning the physical and legal custody of children." (*C.C. v. D.V.* (2024) 105 Cal.App.5th 101, 109–110, quoting §§ 3044, subds. (a)–(b), 3011, 3020.)

"The standard of appellate review of custody . . . orders is the deferential abuse of discretion test. . . . The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child. We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked." (*Burgess*, *supra*, 13 Cal.4th at p. 32, citation omitted.) We presume the move-away order is correct. (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 93–94.) "We accept as true all evidence tending to establish the correctness of the trial court's findings, resolving every conflict in the evidence in favor of the judgment." (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 702.) We do not reweigh the evidence or assess the credibility of witnesses; instead, we defer to the court's adjudication of the facts. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246.) And because the determination of "[w]hat constitutes the best interest of a child presents an inherently factual issue" (*Guardianship of A.L.* (2014) 228 Cal.App.4th 257, 268), our review of this determination is governed by the highly deferential substantial evidence standard (*Burgess*, at p. 32). The burden is on Marian, as the appellant, to establish an abuse of discretion. (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1473–1474.)

III.

*No Abuse of Discretion*

We conclude there was no abuse of discretion by the trial court. After extensive testimony from both parents and multiple witnesses, the court reasonably concluded that it was in the children's best interest to be in Corina's sole legal and sole physical custody, even if she moved them to Los Angeles.

The trial court correctly began by determining the existing custody order under the February 5, 2021 judgment was not a "permanent" or final judicial determination[8] and thus Corina did not have the presumptive right to change the children's residence. (See *Niko*, *supra*, 144 Cal.App.4th at pp. 363–364.)

The trial court next considered application of the section 3044 rebuttable presumption that an award of joint or sole custody to a parent who has perpetrated domestic abuse is not in a child's best interests. For purposes of section 3044, "a person has 'perpetrated domestic violence' when the person is found by the court to have intentionally or recklessly caused or

---

[8] The parties shared joint legal and joint physical custody under the existing custody order set forth in the February 5, 2021 judgment. There is no evidence the custody order stipulated by the parties is a final judicial determination of custody for purposes of the changed circumstance rule. (See *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256–259.) Although the trial court stated it found a history of abuse to be a change of circumstance since the judgment, we do not construe the court to have required either party to demonstrate it was "essential or expedient" for the children's welfare that there be a change to the existing custody order. (See *Burgess*, *supra*, 13 Cal.4th at pp. 37–38 [cleaned up]; *In re Marriage of Carney* (1979) 24 Cal.3d 725, 730.) The record, as we will discuss, establishes the court considered de novo the children's best interest in light of the relevant section 3011 and *LaMusga* factors.

21

attempted to cause bodily injury, or sexual assault, or to have placed a person in reasonable apprehension of imminent serious bodily injury to that person or to another, or to have engaged in behavior involving, but not limited to, threatening, striking, harassing, destroying personal property, or disturbing the peace of another, for which a court may issue an ex parte order pursuant to Section 6320 to protect the other party seeking custody of the child or to protect the child and the child's siblings."  (§ 3044, subd. (c).)

The trial court found "there [wa]s a history of abuse" by Marian which triggered the statutory presumption against awarding custody to him, and that he failed to overcome it.  The court noted that Marian did not demonstrate "remorse" for the abuse or any change in "his attitude toward[ ]" Corina, and expressed that "the court is concerned that he would put his children at risk again."  Substantial evidence supports the court's section 3044 findings.

First, in granting Corina a 2-year DVRO, the trial court found Marian pushed Corina, disturbed her peace, and attempted to exercise coercive control over her during the August 5, 2022 confrontation.  Marian did not appeal the court's DVRO findings, despite his improper attempts to relitigate them at the move-away hearing and here in this appeal.  "[A] finding of domestic abuse sufficient to support a DVPA [(Domestic Violence Prevention Act)] restraining order necessarily triggers the presumption in section 3044."  (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1267.)

Further, although the trial court did not make any explicit findings as to whether Marian brandished a gun to issue the DVRO, at an earlier hearing on December 8, 2022, the court stated, "the court's impression was that he did have a gun" but it would be open to "more evidence [at the move-away hearing] . . . that's not true."  More evidence was introduced on this

topic at the move-away hearing, but it lent further support to the implied finding that Marian did have a gun when he committed domestic abuse against Corina. Alphonso, a close friend of Marian's, testified Marian admitted he brought a gun, and his children, to confront Corina and her boyfriend that night. And by his own testimony, Marian moved all of his firearms (except the antiques) from the Lilac home to Jasmine's house the very next day, conduct which tends to show a consciousness of guilt.

Evidence introduced at the hearing on the move-away request also established that, in 2019, Marian told Corina, and Alphonso, he felt anger and hatred for her such that he had concerns he would kill her in his sleep. Such a confession would reasonably destroy a person's emotional calm and, here, it did because Corina took the children and left that night out of fear. Additionally, Corina discovered cameras in her home and Sergeant Cook, based on his interactions with Marian, opined that Marian was using the cameras to keep Corina under surveillance. Further, there was no dispute Marian sent text messages with photographs of Corina to her friends and family with accusations of Corina's infidelity, in a manner that ensured she would also see the messages. This arguably violated the TRO, which was in effect and precluded any harassment of Corina and contact with her, even indirectly through electronic means.

Substantial evidence also supports the trial court's finding that Marian failed to present credible evidence to overcome the section 3044 presumption. To overcome the statutory presumption that award of custody to a perpetrator of domestic violence is detrimental to the best interest of the child, the court must find the perpetrator has demonstrated that giving sole or joint physical or legal custody of child to him is in the best interest of the child, and the court's determination must be made without consideration of

statutory preference for "frequent and continuing contact with both parents." (Fam. Code, § 3044, subd. (b)(1).) Additional factors the court should consider in this analysis include whether the perpetrator has successfully completed a batterer's treatment program that meets the criteria of Penal Code section 1203.097, a parenting class, and whether the perpetrator has or has not complied with the terms of a protective or restraining order. (Fam. Code, § 3044, subd. (b)(2).) The court found the evidence Marian presented on these factors to be "wholly lacking," and specifically found his therapist, Dean, to be not credible. Rather than demonstrate he understood the gravity of the abuse, and its damaging effects on the children, the court found Marian continued to deny the abuse occurred and continued to blame Corina. We do not reweigh the evidence or credibility.

Thus, there was an unrebutted presumption that awarding joint or sole custody of the children to Marian was detrimental to the children and not in their best interests. With that presumption, the trial court next properly considered the *LaMusga* factors: It found Corina's reasons for the proposed move—that she was afraid of Marian's abuse and wanted her family's support to help her financially—to be credible, and the move was not to frustrate Marian's contact with the children. The distance of the move was approximately 80 miles, an hour and a half to two-hour drive each way. Corina ensured that Marian's parenting time with the children occurred. The relationship between the parties had deteriorated significantly and had not improved since the TRO. The parties' ability to communicate and to cooperate was poor but that was due to Marian's "unwillingness to put the interests of the children above [his] individual interests." Corina was the parent who solely maintained the children's stability and continuity with emotional, educational, medical and health matters. The court found "no

24

evidence was presented" that the children's friendships or relationship with extended family in San Diego had been "interrupted" or negatively impacted.[9] Other factors it found to be neutral, including for example, the children's wishes and communities ties in San Diego.

Thus, on balance, the trial court found it was in the children's best interests for Corina to be awarded sole legal and sole physical custody. The court continued Marian's supervised visitation each weekend and indicated a midweek visitation in the children's community and additional time, including overnight visits, would be appropriate if Marian demonstrates an acknowledgment of the abuse and its detrimental effects on the children. The court concluded its findings with its determination that Marian "has put [the children] and his entire family at significant risk and the court's concern is that he can't put that past in the past." We find no abuse in the court's granting of Corina's move-away request.

As best as we can discern Marian's arguments to the contrary, we do not find them persuasive. Marian repeatedly characterizes the trial court's February 21, 2024 order as a "retro-active Move-Away." However, at a December 8, 2022 hearing, the trial court addressed Marian's RFO for interim custody orders that the children be made to return to San Diego County and to live with him. The court expressed concern of requiring a victim of domestic violence "to stay in the same place where they were victimized for fear – particularly under these circumstances – that there may

---

9    Relying solely on argument of counsel, the concurrence posits that the children's time spent in Los Angeles County between the DVRO and move-away hearing "inevitably and fundamentally altered" the court's *LaMusga* analysis of their best interests. (Conc. opn., *post*, at p. 2.) This position finds no support in the evidence.

be a recurrence" of the abuse. The court denied Marian's RFO, finding that "given [Marian's] high-risk behavior" it would not modify the "custody orders so that the children would live with [him], nor would the court feel comfortable ordering that the children and mother move back into the house because the court's not sure whether or not that would be safe for them at this point." Like the DVRO and order granting Corina sole legal and sole physical custody, Marian has not appealed the court's denial of his RFO. As a result, we have no jurisdiction to review this asserted claim of error. Even if we could overlook this problem—and we cannot—we would find the claim is forfeited because it is unsupported by any cogent argument.

Marian also asserts there were "procedural irregularities," he was denied his right to recall witnesses and the ability to provide a closing argument, and there was judicial bias. The record does not support these claims. The record demonstrates the trial court provided the parties additional time to present their evidence when they had far exceeded the original time estimate. We also note Marian called four of the seven witnesses and testified on his behalf. Throughout the hearing, the court implored Marian to address the relevant issues of whether the section 3044 presumption was rebutted and the children's best interests. Instead, Marian focused on relitigating the court's findings of abuse in granting the DVRO. We conclude Marian was given a meaningful opportunity to present his case and to be heard. Marian also asserts the trial court applied the wrong legal standard, but in irrelevant matters involving whether the court (1) had "jurisdiction over the [M]SA"; (2) "wrongfully classify [*sic*] the ['EVENT'] of the Appellant legally accessing his property, with the children"—which we presume is a reference to the August 5, 2022 incident; and (3) had "authority or jurisdiction over the third-party interloper" (which he has explained is

26

Corina's boyfriend, Shawn).  He fails to discuss the standards that do apply, including *LaMusga*.  The remainder of his arguments focus on why he believes the court's decision is not supported by the facts, but he merely asserts the facts as he perceives them, and not as the court found.  These arguments do not demonstrate error.

## DISPOSITION

The February 21, 2024 Findings and Order After Hearing is affirmed. Corina is entitled to her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2) and (a)(5).)


DO, J.

I CONCUR:


IRION, Acting P. J.

CASTILLO, J., Concurring.

I concur. I write separately, however, to highlight my concern with the trial court's deliberate maintenance of the children's out-of-county move before holding an evidentiary hearing on Corina G.'s move-away request. Though Corina's flight to Los Angeles County is understandable on the facts here, I seek to curb potential misuse of today's holding by future enterprising litigants who might take it as an opportunity to tip the *LaMusga* factors in their favor by asking the trial court's forgiveness—rather than permission—for an out-of-county move. I agree with my colleagues that Marian A. failed to adequately preserve and develop this issue given (1) his failure to appeal the December 8, 2022 denial of his request that the children be returned to San Diego County until the court ruled on Corina's move-away request and (2) the deficiencies of his appellate briefing. (Maj. opn., at p. 26.) Nonetheless, trial courts must be wary of endorsing temporary move-aways or prolonging anticipatory moves that unavoidably and irreversibly alter the children's circumstances for purposes of determining their best interests.

During oral argument, Corina's counsel argued the domestic violence temporary restraining order, which granted Corina sole physical and legal custody, authorized her to move the children. Yet where, as here, no *final* custody determination has been made, Family Code section 7501's rebuttable presumption that the custodial parent has a right to change the child's residence does not apply. (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 20; see also maj. opn. at p. 21 [recognizing the same].) Tellingly, Corina's counsel was unable to identify any case in which a parent moved the children out of their county of residence after a DVRO issued but before an evidentiary hearing on a move-away request.

1

In *Andrew V. v. Superior Court* (2015) 234 Cal.App.4th 103, 107, on the other hand, the court of appeal concluded the trial court erred in allowing "a 'temporary' move[-]away first and a hearing later" because "[a] full adversarial hearing must precede, not follow," the move-away order. "Adherence to fundamental procedural safeguards is critical in move-away situations, which are among the most serious decisions a family law court is required to make, and should not be made in haste." (*Ibid.* [cleaned up].) While the court here issued no formal move-away order on December 8, 2022, the court's denial of Marian's request to return the children to San Diego County pending the evidentiary hearing on Corina's move-away request had the *practical effect* of approving the children's continued residence in Los Angeles County. Thus, *Andrew V.* is instructive. Both there and here, the court's decision "alter[ed] the status quo and affect[ed] the children's interests in stability and continuity." (*Id.* at p. 109.)

While Marian eventually had an opportunity to be heard, the evidentiary hearing on Corina's move-away request did not begin until six months after the children moved and was not concluded until the children had been residing outside San Diego County *for more than 14 months*. According to Corina's trial counsel, during that period, the children grew accustomed to new schools and developed new friendships in Los Angeles County. They also further developed their bonds with their Los Angeles County relatives. This time spent in Los Angeles County thus created a new status quo for the children that inevitably and fundamentally altered the *LaMusga* analysis of their best interests over what it would have been had they remained in San Diego County pending the evidentiary hearing.

Here, legitimate safety concerns triggered the move, and I am mindful of the tensions between exigent domestic violence issues and the pace of the

2

move-away process absent parental consent. I also find it significant Marian blocked access to the family home, which arguably forced Corina's hand in seeking refuge elsewhere. That said, I feel compelled to underscore that the majority's ruling should not be read as an endorsement of parents without a final custody determination preemptively moving their children out of their county of residence without first obtaining either the consent of the other parent or a court order.

CASTILLO, J.

3